**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 19-1709**

─────────────

MAIMOUNA AMELIE BOUNTOULOUGOU,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

─────────────

On Petition for Review of an Order of the Board of Immigration Appeals.

─────────────

Submitted: January 26, 2021                           Decided: March 26, 2024

─────────────

Before KING, AGEE, and RICHARDSON, Circuit Judges.

─────────────

Petition granted by unpublished per curiam opinion.

─────────────

**ON BRIEF:** John E. Gallagher, Catonsville, Maryland, for Petitioner. Jeffrey Bossert Clark, Acting Assistant Attorney General, Mary Jane Candaux, Assistant Director, Remi da Rocha-Afodu, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The petitioner in these immigration proceedings, Maimouna Amelie Bountoulougou, petitions for our review of the order of the Board of Immigration Appeals (the "BIA") dismissing her appeal from the adverse decision of an immigration judge ("IJ"). The IJ not only denied Bountoulougou the relief she sought — including asylum and withholding of removal — but also deemed her permanently ineligible for benefits under the Immigration and Nationality Act (the "Act") on the premise that she had filed a "frivolous" asylum application. *See* 8 U.S.C. § 1158(d)(6).[1] As explained herein, because of error in the IJ's frivolousness analysis, we grant the petition now before us and remand for further proceedings.

I.

A.

Bountoulougou is a native and citizen of the West African country of Burkina Faso who was admitted to the United States in December 2012 at age 20 as a nonimmigrant student. In April 2013, with the assistance of a non-lawyer "preparer," she submitted to the U.S. Citizenship and Immigration Services ("USCIS") an application for asylum and withholding of removal, asserting fears that she would be subjected to female genital mutilation and forced marriage if she returned to her home country (the "Original

---

[1] Bountoulougou also unsuccessfully requested protection under the Convention Against Torture, but she has since abandoned any claim for that form of relief.

2

Application").  In arguable tension with those alleged fears, the Original Application indicated that Bountoulougou had voluntarily wed her boyfriend a few days before departing for the United States, and it listed the name of a husband (a man named Idrissa Kone) who remained in Burkina Faso.  The Original Application also stated, inter alia, that her grandfather and uncles had previously beaten Bountoulougou with a whip because of her resistance to forced marriage, and that, following her arrival in the United States, Bountoulougou discovered she was pregnant.

During a May 2013 interview at a USCIS asylum office, Bountoulougou confirmed that she had wed Idrissa Kone in Burkina Faso just before leaving the country, and she said that Kone was the father of her then-unborn child.  The Department of Homeland Security ("DHS") thereafter initiated removal proceedings against Bountoulougou because she was no longer attending school in the United States, Bountoulougou obtained a lawyer, and a series of hearings before the IJ ensued.  During a December 2014 hearing, Bountoulougou's counsel remarked that Bountoulougou had a "husband" who was "in Africa" and "not helping out."  *See* A.R. 139-40.[2]

In November 2016, however, Bountoulougou filed an amended application for asylum and withholding of removal, stating that she actually was not married (the "Amended Application").  The Amended Application also stated that Bountoulougou had a son who was born in the United States in August 2013.  In support of the Amended

---

[2] Citations herein to "A.R. __" refer to the contents of the Administrative Record in these proceedings.

Application, Bountoulougou asserted not only fears that she would be subjected to female genital mutilation and forced marriage upon her return to Burkina Faso, but also a fear that her son would be subjected to an "honor killing" for being born out of wedlock.

During a November 2016 hearing on the Amended Application, Bountoulougou testified that she had never had a husband. Bountoulougou explained that she told the Original Application's preparer that she was not married, but the preparer took it upon himself to include the statement that Bountoulougou had wed Idrissa Kone in Burkina Faso just before departing for the United States. According to Bountoulougou (whose native language is French and who could read but not fluently speak English), she asked the preparer after reviewing the Original Application why it said that she was married, and the preparer responded that he was "used to doing these for people" and that saying Bountoulougou was married was "the way it [was] done." *See* A.R. 201-02. Bountoulougou testified that she did not prepare the Original Application herself because she did not know how to do so, and that the inclusion of the statement that Kone was her husband was not "done according to [her] free will." *Id.* at 202. Further, Bountoulougou testified that she did not know Kone, but that she understood Kone to be the preparer's nephew and someone for whom the preparer may have been seeking to obtain an immigration benefit. Bountoulougou also clarified that her son's father was not Kone, but another man in Burkina Faso to whom she was not married.

With respect to the May 2013 asylum interview, Bountoulougou expressed difficulty recalling what had occurred, explaining that she had been six months pregnant at the time and feeling physically unwell, stressed, and afraid. She acknowledged, however,

4

that she had falsely confirmed during the asylum interview that, as stated in the Original Application, she was married to Idrissa Kone. In addition to admitting that falsehood, she conceded that the Original Application incorrectly stated that her grandfather and uncles had beaten her with a whip, though she testified to physical abuse perpetrated by an aunt. Indeed, Bountoulougou's lawyer proffered at the November 2016 hearing that "we're ready to stipulate that [the Original Application] prepared by the non-attorney is rife with inconsistencies and incorrectness." *See* A.R. 221.

## B.

The IJ denied the Amended Application by the adverse decision of April 2017 (the "IJ Decision").[3] In pertinent part, the IJ Decision related that Bountoulougou "admit[ted] that [the Original Application] contained false information regarding her marital status," but that she requested the IJ to disregard such false information "because she followed the instructions of a preparer . . . who completed and filed the [Original Application] on [her] behalf." *See* IJ Decision 3. As for the response from DHS, the IJ Decision described DHS's position as being that — because Bountoulougou "submitted the [Original Application] with false information and then repeated the alleged falsehoods in her interview with the asylum office" — she should be both denied any relief for lack of credibility and ruled forever barred from any immigration benefits under the Act for filing a frivolous asylum application. *Id.*

---

[3] The IJ Decision is found at A.R. 63-84.

5

The IJ Decision first assessed Bountoulougou's request for asylum and the issue of her credibility. The IJ found that Bountoulougou was "not credible," citing, inter alia, her admission that she "lied" about being married to Idrissa Kone in the Original Application and during her asylum interview. *See* IJ Decision 15. Additionally, the IJ attributed to Bountoulougou her lawyer's remarks during the December 2014 hearing about Bountoulougou having a husband who was in Africa. *Id.* The IJ Decision explained that, although Bountoulougou "admitted these falsehoods" by the time of her Amended Application, her prior "attempts to deceive immigration officials [were] troubling and relevant to the determination of credibility." *Id.* at 16. The IJ Decision further ruled that Bountoulougou failed to "provide independent evidence of past persecution or a well-founded fear of future persecution" sufficient "to overcome the adverse credibility finding." *Id.* at 18-19. The IJ Decision thus concluded that Bountoulougou's asylum claim "must be denied." *Id.* at 19.

The IJ Decision then turned to the 8 U.S.C. § 1158(d)(6) analysis of whether Bountoulougou should be ruled permanently ineligible for immigration benefits under the Act for filing a frivolous asylum application. As a precursor to that analysis, the IJ Decision observed that "[a]n application is frivolous 'if any of its material elements is deliberately fabricated.'" *See* IJ Decision 13 (quoting 8 C.F.R. § 1208.20 (2001)). Moreover, the IJ Decision related that the IJ "must provide cogent and convincing reasons for determining that a preponderance of the evidence supports a frivolousness finding." *Id.* (citing *In re Y-L-*, 24 I. & N. Dec. 151, 158 (BIA 2007)). The IJ Decision also recognized the BIA's "four-part test" for a frivolousness determination. *Id.* Under that test,

6

> (1) the respondent must receive notice of the consequences of filing a frivolous application; (2) the [IJ] must make a specific finding that the [respondent] knowingly filed a frivolous application; (3) there must be sufficient evidence that a material element of the claim was deliberately fabricated; and (4) there must be an indication that the respondent has been afforded a sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

*Id.* (citing *Y-L-*, 24 I. & N. Dec. at 155).

The IJ Decision concluded that each element of the four-part test was satisfied in Bountoulougou's case. *See* IJ Decision 19-20. Of particular relevance herein, the IJ found as to the second element that Bountoulougou "knowingly submitted an application containing false information," in that she "conceded that she knowingly submitted an asylum application containing false information" — i.e., the Original Application — "and continued to perpetrate such falsehoods during her asylum interview." *Id.* at 19. The IJ Decision elaborated that,

> [a]ccording to [Bountoulougou's November 2016 hearing] testimony, she claimed that she was married to Mr. Kone in [the Original Application] and in her asylum interview when in fact she was not. Describing her motivation for including the fabrication, [Bountoulougou] explained that the preparer of [the Original Application] told her that saying she was married was "the way it [was] done," so she followed his instructions. She also conceded that she lied in [the Original Application] when she stated that her uncle[s] and grandfather beat her.

*Id.* (sixth alteration in original). As such, the IJ's finding that Bountoulougou knowingly submitted a frivolous application was limited to the Original Application and her concessions of falsehoods therein, including the falsehood that she had wed Idrissa Kone in Burkina Faso.

7

With respect to the third element, the IJ Decision ruled that "the fabrication regarding [Bountoulougou's] marital status is material to her asylum claim." *See* IJ Decision 20. The IJ Decision's materiality ruling proceeded as follows:

> [T]he fabrication regarding [Bountoulougou's] marital status is material to her asylum claim because it is integral to the analysis of [her] suggested particular social group, defined as "uncircumcised Mossi women of Burkina Faso who are subjected to forced marriages." [Bountoulougou] stated that she was married on three occasions: in [the Original Application], in her asylum interview, and [by way of her lawyer during the December 2014 hearing]. However, during her [November 2016 hearing] testimony, she claimed that she was not married and therefore feared forced marriage and [female genital mutilation]. Assuming [Bountoulougou] is married, [the Amended Application] is baseless because the false statement regarding her marital status is material to her membership in the proposed particular social group.

*Id.* (citation omitted). In other words, the IJ Decision based its materiality ruling on an "[a]ssum[ption]" — rather than a finding — that Bountoulougou lied in her Amended Application when she said she was not married in order to substantiate her alleged fears of forced marriage and female genital mutilation. Meanwhile, the IJ Decision did not address or decide in its frivolousness analysis the materiality of any falsehood that the IJ did find, including the falsehood in the Original Application that Bountoulougou had wed Idrissa Kone in Burkina Faso.

Following its frivolousness determination against Bountoulougou, the IJ Decision considered her request for withholding of removal. Although the IJ Decision recognized that "[a] finding of frivolity shall not bar an application for withholding of removal," *see* IJ Decision 13 (citing 8 C.F.R. § 1208.20 (2001)), the IJ Decision concluded that Bountoulougou's failure to substantiate her asylum claim meant "that she fail[ed] to meet

8

the higher burden of proof for withholding of removal," *id.* at 20. Having thereby denied the entirety of the Amended Application, the IJ Decision ordered Bountoulougou removed to Burkina Faso. *Id.* at 22. The IJ Decision also reiterated that, because Bountoulougou "knowingly submitted an asylum application containing false information," she "is permanently ineligible for any benefits under the Act." *Id.* at 21.

C.

The BIA subsequently dismissed Bountoulougou's appeal from the IJ Decision by order of a single BIA member in June 2019 (the "BIA Order").[4] In so doing, the BIA Order first reviewed the IJ's adverse credibility finding. The BIA Order "discern[ed] no clear error in [that] finding," specifically citing the IJ's reliance on Bountoulougou's "admission that she lied in [the Original Application and during her asylum interview] by stating that she was married to Idrissa Kone when in fact she was not married." *See* BIA Order 1. Based on that falsehood as well as "other inconsistencies and implausibilities in the record," the BIA Order concluded that the IJ "reasonably doubted" Bountoulougou's veracity. *Id.* at 1-2.

Next, the BIA Order approved the IJ Decision's denial of asylum based on Bountoulougou's failure to provide independent evidence sufficient to overcome the adverse credibility finding. *See* BIA Order 2. For similar reasons, the BIA Order also approved the IJ Decision's denial of withholding of removal. *Id.*

---

[4] The BIA Order is found at A.R. 3-5.

9

Finally, the BIA Order addressed the IJ Decision's ruling that Bountoulougou is permanently ineligible for immigration benefits under the Act for filing a frivolous asylum application. The BIA Order concluded there was no error in the IJ Decision's application of the four-part test for a frivolousness determination. *See* BIA Order 2-3. Regarding the second element, the BIA Order discerned no clear error in the IJ's finding that Bountoulougou "knowingly made a deliberate fabrication." *Id.* at 2. The BIA Decision explained this was because Bountoulougou "conceded that she deliberately fabricated in [the Original Application] that she is married and perpetuated the fabrication in her asylum interview." *Id.*

As for the third element of the frivolousness test, the BIA Order summarily stated that there was no clear error in the IJ's finding "that the deliberate fabrication was a material element of the asylum application." *See* BIA Order 2. The BIA Order elaborated only that "[w]e discern no clear error in the [IJ's] finding[] . . . that the false information is material to [Bountoulougou's] asylum claim," and that, "[t]hus, the [IJ] provided cogent and convincing reasons for finding that a preponderance of the evidence shows that material aspects of the claim were deliberately fabricated." *Id*. This was the totality of the BIA Order's discussion of the materiality issue.

Bountoulougou timely filed her petition for this Court's review of the BIA Order dismissing her appeal from the IJ Decision, and we possess jurisdiction pursuant to 8 U.S.C. § 1252(a)(1).

10

II.

By her petition for review, Bountoulougou challenges the adverse credibility finding and the denials of asylum and withholding of removal that underlie the order that she be removed to Burkina Faso. Additionally, Bountoulougou contests the determination that she is permanently ineligible for immigration benefits under the Act for filing a frivolous asylum application. As previously stated, we are granting the petition and remanding for further proceedings on the basis of error in the IJ Decision's frivolousness analysis. We therefore need not — and do not — reach and resolve any other questions, including the issues related to the adverse credibility finding and the denials of asylum and withholding of removal. Nothing in our decision prevents the agency from revisiting those matters, as appropriate, on remand.

A.

As the BIA itself recognized in its 2007 *Y-L-* decision formulating standards for frivolousness determinations, such a determination "is a preemptive determination" with "severe consequences," in that, "once made," it "forever bars an alien from any benefit under the Act." *See In re Y-L-*, 24 I. & N. Dec. 151, 157 (BIA 2007). In the words of one of our sister courts of appeals, "[a] finding of a frivolous application carries catastrophic consequences" and "is the veritable 'death sentence' of immigration proceedings." *See Yousif v. Lynch*, 796 F.3d 622, 627 (6th Cir. 2015) (internal quotation marks omitted).

The power to render a frivolousness determination stems from the asylum statute, 8 U.S.C. § 1158, which provides in relevant part as follows:

11

> If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A) [advising of the consequences of knowingly filing such an application], the alien shall be permanently ineligible for any benefits under [the Act], effective as of the date of a final determination on such application.

*See* 8 U.S.C. § 1158(d)(6). At the time of the BIA's *Y-L-* decision (as well as the IJ Decision herein), the regulation pertaining to frivolousness determinations provided that "an asylum application is frivolous if any of its material elements is deliberately fabricated." *See* 8 C.F.R. § 1208.20 (2001).[5]

The BIA's *Y-L-* decision recognized that — "[g]iven the serious consequences of a frivolousness finding" — "the regulation provides a number of procedural safeguards." *See* 24 I. & N. Dec. at 155. The *Y-L-* decision specified that

> [t]hese include the following requirements: (1) notice to the alien of the consequences of filing a frivolous application; (2) a specific finding by the [IJ] or the [BIA] that the alien knowingly filed a frivolous application; (3) sufficient evidence in the record to support the finding that a material element of the asylum application was deliberately fabricated; and (4) an indication that the alien has been afforded sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

*Id.* The regulatory requirements delineated in *Y-L-* are the elements of the "four-part test" for a frivolousness determination set forth in the IJ Decision herein. *See* IJ Decision 13 (citing and paraphrasing this language of *Y-L-*).

---

[5] In its current form, the regulation pertaining to frivolousness determinations similarly provides that an asylum application filed on or after April 1, 1997, and before January 11, 2021, is frivolous if "[a]ny of the material elements in the asylum application is deliberately fabricated." *See* 8 C.F.R. § 1208.20(a)(1) (2021).

12

With respect to the second and third regulatory requirements, the *Y-L-* decision explained that an IJ's "specific finding that a respondent deliberately fabricated a material element of his asylum claim constitutes a finding that he knowingly filed a frivolous application." *See* 24 I. & N. Dec. at 156. The *Y-L-* decision also emphasized that "a finding of frivolousness does not flow automatically from an adverse credibility determination." *Id.* (internal quotation marks omitted). Rather, an IJ "must separately address the question of frivolousness, including a discussion of the evidence supporting a finding that the respondent deliberately fabricated a material element of the asylum claim." *Id.*

Furthermore, "[b]ecause of the severe consequences that flow from a frivolousness finding," the *Y-L-* decision recognized that "the preponderance of the evidence must support an [IJ's] finding that the respondent knowingly and deliberately fabricated material elements of the claim." *See* 24 I. & N. Dec. at 157. Indeed, "the [IJ] must provide cogent and convincing reasons for finding by a preponderance of the evidence that an asylum applicant knowingly and deliberately fabricated material elements of the claim." *Id.* at 158; *see* IJ Decision 13 (recognizing the IJ's obligation under *Y-L-* to "provide cogent and convincing reasons for determining that a preponderance of the evidence supports a frivolousness finding").

Of additional import, the *Y-L-* decision specified that it is the Government — and not the respondent — who bears "the ultimate burden of proof." *See* 24 I. & N. Dec. at 158. And, consistent with the fourth regulatory requirement, "particular attention [must] be given to providing the alien a sufficient opportunity to account for any discrepancies or implausible aspects of the claim relied on in the frivolousness finding." *Id.* The BIA

13

considers the issue of "whether a fabrication was knowing or deliberate" to be "a factual question of intent that is reviewed for clear error"; the issue of "[w]hether a fabrication was material" to be a "mixed question[] of fact and law"; and the issue of "[w]hether the [IJ] properly applied the regulatory framework" to be a pure "question of law." *Id.* at 159.

## B.

In these proceedings, as we have explained, the IJ's finding as to the second regulatory requirement that Bountoulougou knowingly submitted a frivolous asylum application was limited to the Original Application and her concessions of falsehoods therein, including the falsehood that she had wed Idrissa Kone in Burkina Faso just before departing for the United States. *See* IJ Decision 19. Significantly, the IJ Decision did not expressly rule that the subsequent Amended Application was also frivolous, nor did the IJ state any finding that Bountoulougou lied in the Amended Application by asserting that she actually was not married. This reading of the IJ Decision is confirmed by the BIA Order, which understood the IJ's finding that Bountoulougou "knowingly made a deliberate fabrication" to be supported by her concession "that she deliberately fabricated in [the Original Application] that she is married and perpetuated the fabrication in her asylum interview." *See* BIA Order 2. Moreover, the BIA Order accepted that Bountoulougou "lied in [the Original Application and during her asylum interview] by stating that she was married to Idrissa Kone *when in fact she was not married*." *Id.* at 1 (emphasis added). The BIA Order did not contemplate that the IJ Decision found the Amended Application to be frivolous in any way.

14

Nevertheless, in ruling as to the third regulatory requirement that "the fabrication regarding [Bountoulougou's] marital status is material to her asylum claim," the IJ Decision relied on an "[a]ssum[ption]" that Bountoulougou lied in her Amended Application when she said she was not married in order to substantiate her alleged fears of forced marriage and female genital mutilation. *See* IJ Decision 20. That is, the IJ Decision reasoned that — "[a]ssuming [Bountoulougou] is married" — the Amended Application "is baseless because the false statement regarding her marital status is material to her membership in the proposed particular social group [of uncircumcised Mossi women of Burkina Faso who are subjected to forced marriages]." *Id.* The IJ Decision did not address or decide in its frivolousness analysis the materiality of any falsehood that the IJ did find, including the falsehood in the Original Application that Bountoulougou had wed Idrissa Kone in Burkina Faso. And thereafter, the BIA Order summarily approved the IJ Decision's materiality ruling without acknowledging and contending with the reasoning stated — and not stated — for that ruling. *See* BIA Order 2.

In the briefs submitted to this Court, Bountoulougou challenges the IJ Decision's materiality ruling and argues that the IJ could not have properly found that the Original Application's fabrication of the marriage to Idrissa Kone was material because that fabrication "actually hurts" Bountoulougou's asylum claim. *See* Br. of Pet'r 13. According to Bountoulougou, "[b]y having a spouse listed [in the Original Application, she was] essentially foreclosing the portion of her claim in which she feared being forced to marry a man by her family." *Id.* at 15. As such, Bountoulougou contends that — if the IJ had deemed the Original Application's fabrication of the marriage to be material — that

15

would have been a finding that was "clearly erroneous." *Id.* at 13-14. For support, Bountoulougou invokes authorities suggesting that a fabrication must be helpful to an asylum claim in order to be material. *See id.* at 14 (citing, e.g., *In re Bosuego*, 17 I. & N. Dec. 125, 130 (BIA 1980), explaining that a misrepresentation is material for purposes of an inadmissibility determination under 8 U.S.C. § 1182 "if either (1) the alien is excludable on the true facts or (2) the misrepresentation tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded"); *see also Y-L-*, 24 I. & N. Dec. at 159 (describing materiality in the frivolousness analysis as a "mixed question[] of fact and law").

The Government counters by insisting that — notwithstanding the IJ Decision's language that it merely assumed that Bountoulougou lied about not being married in the Amended Application — the IJ Decision actually found both the Original Application and the Amended Application to be frivolous. *See* Br. of Resp't 50 (asserting that the IJ Decision's frivolousness "analysis rested on the reasoning that [the Amended Application] was also frivolous and that [Bountoulougou] amended [the Original Application] to fit her newly-proffered particular social group of 'uncircumcised Mossi women of Burkina Faso who are subjected to forced marriages'"). The Government premises its theory on an implicit frivolousness finding and argues that — because the IJ found that Bountoulougou generally "was not credible" — the IJ "was not required to credit *any* of her statements" and thus "was eminently justified in concluding that [the Amended Application] was also fabricated." *Id.* at 51. As the Government would have it, although the IJ Decision's materiality ruling pertained only to the Amended Application, the frivolousness analysis is

16

unassailable because the IJ implicitly and properly found, based on Bountoulougou's general lack of credibility, that the Amended Application was frivolous for falsely stating that Bountoulougou was not married.

C.

We are constrained to conclude that the IJ Decision's frivolousness determination was erroneous as a matter of law in that the IJ failed to properly apply the agency's own regulatory framework. *See Y-L-*, 24 I. & N. Dec. at 159 (designating the issue of "[w]hether the [IJ] properly applied the regulatory framework" as "a question of law"); *see also Yousif*, 796 F.3d at 628 (explaining that "[w]hen reviewing a frivolousness finding, we review questions of law de novo"). In particular, the IJ Decision failed to make the required "specific finding that [Bountoulougou] deliberately fabricated a material element of [her] asylum claim." *See Y-L-*, 24 I. & N. Dec. at 156. Under the regulatory framework, the IJ Decision should have specifically found both a deliberate fabrication and the materiality of that same fabrication. Instead, the IJ Decision specifically found one deliberate fabrication (the Original Application's statement that Bountoulougou was married to Idrissa Kone) but the materiality of another (the Amended Application's statement that Bountoulougou was not married at all). Moreover, the IJ Decision merely "[a]ssum[ed]" the deliberate fabrication in the Amended Application, *see* IJ Decision 20, and it made no finding as to the materiality of the deliberate fabrication in the Original Application.

In therefore concluding that the IJ Decision's frivolousness determination was erroneous as a matter of law, we are not resolving whether we agree with Bountoulougou's

17

contention that the IJ could not have properly found the deliberate fabrication in the Original Application to be material. That argument presents a hypothetical issue — whether the IJ would have erred as either a pure question of fact or a mixed question of fact and law if he had ruled that the Original Application's fabrication was material — that is not properly before us.

We do, however, reject the Government's theory that — notwithstanding the IJ Decision's plain language "[a]ssuming" the Amended Application's deliberate fabrication, *see* IJ Decision 20 — the IJ implicitly and properly found, based on Bountoulougou's general lack of credibility, that Bountoulougou lied in the Amended Application about not being married. The Government's theory is palpably inconsistent with the BIA's *Y-L-* decision, in that an implied finding of a deliberate fabrication cannot be said to qualify as the requisite "specific finding," nor can a deliberate fabrication finding "flow automatically from an adverse credibility determination." *See* 24 I. & N. Dec. at 156 (internal quotation marks omitted).

The notion that the IJ somehow properly found that Bountoulougou lied in the Amended Application about her marital status is further contradicted by *Y-L-*'s recognition of the following: an IJ's obligations to discuss the evidence supporting a deliberate fabrication finding and to "provide cogent and convincing reasons for finding [a deliberate fabrication] by a preponderance of the evidence"; the Government's burden to prove a deliberate fabrication; and the opportunity that must be accorded to the respondent "to account for any discrepancies or implausible aspects of the claim relied on in the frivolousness finding." *See* 24 I. & N. Dec. at 156-58. Here, the IJ Decision neither

discussed evidence tending to show that Bountoulougou actually was married when she stated in the Amended Application that she was not, nor provided any reason for finding such a deliberate fabrication by a preponderance of the evidence. The IJ Decision also did not mention any effort by the Government to prove that Bountoulougou lied about her marital status in the Amended Application. *See* IJ Decision 3 (describing the Government's position as being that Bountoulougou lied in the Original Application alone). And although it is undisputed that Bountoulougou was accorded a sufficient opportunity to account for the admitted falsehoods in the Original Application, there is no indication the same is true with respect to any alleged falsehood about her marital status in the Amended Application.

At bottom, the Government's theory does not save the IJ Decision from the conclusion that the IJ failed to properly apply the controlling regulatory framework. Simply put, before being subjected to the harsh consequences of the IJ Decision's frivolousness determination, Bountoulougou was entitled to procedural safeguards that she was not afforded. *Cf. Ndibu v. Lynch*, 823 F.3d 229, 236 (4th Cir. 2016) (denying the petition for review where, contrary to the petitioner's arguments, he received satisfactory notice of the consequences of filing a frivolous asylum application); *Y-L-*, 24 I. & N. Dec. at 162 (sustaining the respondent's appeal from a frivolousness finding that did "not meet the regulatory requirement that the respondent be afforded a sufficient opportunity to explain perceived discrepancies or implausibilities").

19

III.

Pursuant to the foregoing, we grant Bountoulougou's petition for review and remand for such other and further proceedings as may be appropriate.

*PETITION GRANTED*